UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GAGAN VOHRA,

           Plaintiff,

  - against-

AMERICAN INTEGRATED SECURITY GROUP,
et al.,

           Defendants.
-------------------------------------------------------------------X

**MEMORANDUM DECISION AND ORDER**
16-CV-5374 (AMD) (SMG)

**ANN M. DONNELLY, United States District Judge:**

On September 27, 2016, the plaintiff brought this action against his former employers, alleging federal and state claims for discrimination and retaliation. (ECF No. 1 ¶¶ 1-5, 9-23.) On February 4, 2019, the defendants moved for summary judgment on all of the plaintiff's claims. (ECF No. 47.) For the reasons that follow, the defendants' motion on the plaintiff's discrimination claims is denied and their motion on the plaintiff's retaliation claims is granted.

### BACKGROUND[1]

The plaintiff had three interviews for the position of Chief Financial Officer (CFO) with corporate defendant American Integrated Security Group (AISG) in the spring of 2015. (ECF No. 53 ¶ 10.) Defendant Levy Acs, AISG's President and Chief Technology Officer, was present for all three interviews and defendant Avi Jacobi, the Chief Executive Officer, was there

---

[1] Unless otherwise noted, the factual background is based on my review of the entire record, including the parties' 56.1 statements. I construe the facts in the light most favorable to the plaintiff, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

1

for one interview.[2] (ECF No. 47-2 ¶¶ 1, 5; ECF No. 47-4 ¶ 1.) During the interviews, the plaintiff and the defendants discussed the terms of the plaintiff's possible employment; the defendants said that the plaintiff could hire his own staff and have a private office, but did not specify when either of those things would happen. (ECF No. 53 ¶ 10; ECF No. 59 ¶ 22.) According to the plaintiff, Acs and Jacobi promised that current AISG employees would report to him until he was able to hire his own support staff. (ECF No. 59 ¶¶ 20, 21.)

The defendants hired the plaintiff out of a field of five or six candidates, effective May 11, 2015. (ECF No. 59 ¶ 3, 9, 10, 53; ECF No. 55-28, Acs Dep. Tr. 23:17-25, 26:12-23.) The CFO position was one of three executive officer positions at AISG; Acs and Jacobi were the other two executives. (ECF No. 53 ¶ 12.) The plaintiff was hired to address certain financial issues, including multistate sales tax issues, accounting, and internal financial controls. (ECF No. 53 ¶ 22; ECF No. 59 ¶¶ 17, 54; Acs Dep. Tr. 27:1-10.) At the time they hired the plaintiff, the defendants believed that he was well-qualified and had the requisite experience and skills to do the job. (ECF No. 47-2 ¶¶ 5-6; ECF No. 47-4 ¶ 3.)

Shortly before his first day of work, the plaintiff was given a package of documents for new AISG employees. (ECF No. 59 ¶ 13.) According to the defendants, the package included the AISG employee handbook, which specifies that all employment is at-will and that the first 90 days of employment is a probationary period. (ECF No. 47-2 ¶ 9; ECF No. 47-3 ¶ 5, Ex. G; ECF No. 59 ¶ 13, 14-15, 37.) The plaintiff acknowledges that he received paperwork when he was hired, and agrees that his employment was at-will, but does not remember receiving or reading the handbook. (ECF No. 53 ¶ 14; ECF No. 59 ¶¶ 13, 14.) Despite the policy in the handbook,

---

[2] The defendants founded AISG in 2007. (ECF No. 47-2 ¶ 2; ECF No. 47-4 ¶ 2.) AISG designs, implements and monitors advanced commercial security systems and currently has more than 50 employees. (ECF No. 47-4 ¶ 2.)

the plaintiff disputes that he had a 90-day probationary period; he says his employment offer letter did not mention a probationary period, nor did anyone tell him about it; therefore, it did not apply to him.[3] (*See* ECF No. 59 ¶ 38 (citing Job Offer Letter ECF No. 55-2); ECF No. 53 ¶ 16.)

*The Plaintiff's Employment and Termination*

The plaintiff maintains that his employment was problematic from the beginning. He had a cubicle rather than a private office, while Eldy Guzman, who was not an executive, had her own office.[4] (ECF No. 53 ¶¶ 45-46; ECF No. 59 ¶¶ 21-22, 24.) He was not allowed to hire support staff, and none of the current AISG employees reported to him, although he "occasionally request[ed] some information from certain employees in order… to complete [his] tasks as CFO." (ECF No. 53 ¶ 19; ECF No. 59 ¶¶ 19-20.) The defendants respond that they planned to give the plaintiff a private office eventually, but did not yet have the space available. (ECF No. 59 ¶¶ 22, 23.) They also maintain that they were "working on" getting the plaintiff dedicated support staff, and told the plaintiff that he could ask other AISG employees for help, which he did. (ECF No. 59 ¶¶ 19-20.)

The defendants believed that the plaintiff was well-qualified when they hired him, but changed their minds after he began work, and realized that he did not have the requisite accounting experience or skills needed to be the CFO. (ECF No. 47-2 ¶¶ 11-21; ECF No. 47-4 ¶ 5.) For example, Acs says that the plaintiff delegated tasks that he should have completed himself, appeared not to know basic accounting concepts, was unfamiliar with filing sales tax

---

[3] The plaintiff does not believe that he signed the standard AISG form acknowledging that he received the handbook, and the defendants do not have a record that he signed the form. (ECF No. 59 ¶¶ 14, 62; Acs Dep. Tr. 38:4-41:24.) However, the plaintiff filled out a "New Hire Checklist" on April 27, 2015, and checked off the line next to "Receipt of Employee Handbook." (*See* ECF No. 47-3 ¶ 4, Ex. V.) The Handbook provides that all full-time employees are "on an introductory period during their first 90 days of employment." (ECF No. 47-3 ¶ 5, Ex. G.)

[4] The plaintiff does not say whether he expected Ms. Guzman to vacate her office for him.

reports, and did not know how to operate the Quickbooks software program.[5] (ECF No. 47-2 ¶¶ 11-21, 22-28.) The defendants allege that the plaintiff caused the entire software system to shut down on multiple occasions because of his lack of proficiency with Quickbooks, which prevented other employees from using the system. (ECF No. 47-2 ¶¶ 18-20; ECF 47-3 ¶ 9-11, Ex. M; ECF No. 59 ¶¶ 26-29.) The plaintiff also called Quickbooks telephone technical support frequently; Acs overheard one call in which the plaintiff spoke Hindi to the support specialist, which led Acs to believe that the plaintiff was sharing confidential financial information with the technical support specialist.[6] (ECF No. 47-2 ¶¶ 18, 34.) Acs says that the plaintiff revealed confidential financial information to Quickbooks technical support "each time" he asked them questions about the software. (ECF No. 47-2 ¶ 18.) The plaintiff does not dispute that he called Quickbooks "several times," but he does dispute that he caused the system to shut down, or gave Quickbooks confidential information. (ECF No. 59 ¶ 26; *see also* ECF No. 53 ¶¶ 28-31.)

The parties agree that the plaintiff had a "confrontation and verbal altercation" with Ms. Guzman on June 23, 2015, but dispute how the altercation started and who was to blame. (ECF No. 47-3 ¶ 19; ECF No. 59 ¶¶ 35, 71; *see also* ECF No. 53 ¶ 42; ECF No. 55-29, Guzman Dep. Tr. 136:1-7.) The plaintiff says that Ms. Guzman raised her voice at him and "attacked" him in the office. (ECF No. 59 ¶ 71.) The defendants say that when Ms. Guzman tried to speak to the plaintiff about his inappropriate delegation of work, the plaintiff yelled at her "in a loud voice" and "made fists with both hands and thrust[] them at [her]," requiring another male employee to

---

[5] It is undisputed that the plaintiff reported to Acs and had little interaction with Jacobi throughout his 90-day employment at AISG. (ECF No. 59 ¶¶ 11, 12.)
[6] It is not clear why Acs, who does not appear to speak Hindi, reached this conclusion.

4

intervene.[7] (ECF No. 47-2 ¶ 26; ECF No. 47-3 ¶¶ 18-21.) Contemporaneous emails support this account. (ECF Nos. 50-9, 50-10.)

Defendant Jacobi fired the plaintiff on August 12, 2015, 93 days after his first day at AISG. (ECF No. 55-3; ECF No. 59 ¶¶ 36, 57.) The defendants proffer various reasons for their decision to fire the plaintiff at the end of the 90-day probation period: they say that he was not qualified for the position, that he disturbed other employees by playing loud music through his headphones, that he watched television at his desk during work hours, and that he had several unpleasant interactions with other employees. (ECF No. 59 ¶¶ 28-35; Acs Dep. Tr. 93:7-23; *see also* ECF No. 47-2 ¶¶ 22-28; ECF No. 47-3 ¶¶ 22-24.) According to the plaintiff, the defendants replaced him with George Getlich, who is not Indian.[8] (ECF No. 53 ¶ 59.)

*The Alleged Discrimination and Retaliation*

The plaintiff argues that the defendants discriminated against him by denying him a private office and support staff, while other "non-Indian" employees, like Ms. Guzman, were given a private office and support staff.[9] (ECF No. 53 ¶¶ 45-46; ECF No. 59 ¶ 24.) The plaintiff says that the defendants responded to his business concerns by saying, "Jews always find a way to get away with stuff and make money;" he also claims that they "repeatedly" said, "The company has been making money, that's why Jews are smarter than Indians." (ECF No. 53 ¶¶ 47-48.) The plaintiff claims to have made "several verbal complaints in front of defendants Acs and Jacobi, as well as other employees" of "discrimination and harassment," but does not

---

[7] Ms. Guzman was not disciplined for the confrontation and voluntarily left her employment with AISG after the plaintiff's termination. (ECF No. 59 ¶ 71; Acs Dep. Tr. 18:7-16, 90:3-10.)
[8] The plaintiff does not give any additional information about Mr. Getlich's qualifications.
[9] Ms. Guzman, the Vice President of Administration at AISG, was not similarly situated to the plaintiff; she was not an executive-level employee and had worked at AISG for two years before the plaintiff arrived. (ECF No. 53 ¶¶45-46; ECF No. 59 ¶ 24.)

5

include any detail about what he said, or when he made the complaints.[10] (ECF No. 59 ¶¶ 40, 43, 93.) He admits that he did not make any written complaints about discrimination. (*Id.*) The plaintiff claims, however, that the defendants fired him because he complained about discrimination.[11] (ECF No. 53 ¶ 93.) The defendants respond that the plaintiff's EEOC charge, filed on November 18, 2015, was the first and only complaint they received. (ECF No. 47-2 ¶ 35; *see also* ECF No. 17 ¶ 23.)

The defendants also deny that they made these statements, and point out that they knew the plaintiff was Indian when they hired him; they say that it makes no sense that they hired him despite harboring a bias against him. (ECF No. 47-2 ¶ 32; ECF No. 47-4 ¶ 8.) As for the office situation, the defendants also say that only Acs, Jacobi, and Guzman, senior employees who had been working at AISG for over two years, had private offices. (ECF No. 47-2 ¶ 30; ECF No. 47-4 ¶ 9.) The defendants agree that they did not immediately hire support staff for the plaintiff, but they had never given the plaintiff a date certain, and they planned to hire additional staff eventually. (ECF No. 47-2 ¶ 31; ECF No. 47-4 ¶ 9.)

---

[10] The plaintiff asserts that he told his treating psychiatrist that the defendants discriminated against him, a complaint the psychiatrist recorded in written notes. (ECF No. 59 ¶¶ 40, 43 (citing defendants' exhibits).) However, the exhibits upon which the plaintiff relies do not support the plaintiff's version. The treatment notes submitted by the defendants show that the plaintiff first saw Dr. Shama Saqi on July 14, 2014, and Dr. Deepika Ramchandani in 2016, long after his termination. (ECF No. 49-1, 49-2.) Dr. Saqi's notes make no mention of discrimination. (*See* ECF No. 49-2.) In any event, the fact that the plaintiff might have complained to his doctor is not relevant on the question of retaliation, since the notes do not say that the plaintiff complained about discrimination to the defendants during his employment.

[11] The plaintiff also argues that he complained about "errors and potential unlawful action" that he observed while working for the defendants. (*See, e.g.,* ECF No. 52 at 9; ECF No. 53 ¶ 93.) There are no facts in the record to support these claims, so I will not consider them in deciding this motion.

6

The plaintiff also asserts that he spoke to his wife on the phone during his lunch hour and that the defendants asked him not to speak Hindi at the office "several times per week."[12] (ECF No. 53 ¶ 49; ECF No. 59 ¶ 32.) Defendant Acs admits that he asked the plaintiff not to speak Hindi on the telephone one time, but that he made the request out of concern that the plaintiff was sharing confidential company information with a Quickbooks support specialist. (Acs Dep. Tr. 66:5-25; ECF No. 47-2 ¶ 34.) He denies that anyone told the plaintiff he could not speak Hindi on his personal calls or at any other time.[13] (ECF No. 47-2 ¶¶ 33-34.)

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the "burden of showing the absence of any genuine dispute as to a material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 453–54 (S.D.N.Y. 2012) ("While disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." (quoting *Anderson*, 477 U.S. at 248)). "Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp.

---

[12] In a declaration in opposition to the defendants' motion, the plaintiff's wife asserts that she "personally heard individuals next to my husband, who I later learned to be defendants Acs and Jacobi, telling Gagan not to speak in Hindi." (ECF No. 54 ¶ 3.)

[13] Ms. Guzman says that she told the plaintiff to lower his voice when he was making personal calls because he was disturbing other workers, but never told him not to speak Hindi. (ECF No. 47-3 ¶ 23-24.)

7

3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). In deciding whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008). Because the defendants are moving for summary judgment, I draw all reasonable inferences in the plaintiff's favor.

## DISCUSSION

The plaintiff alleges discrimination based on race, national origin, and religion, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, New York State Human Rights Law (NYSHRL) N.Y. Exec. Law § 296, and New York City Human Rights Law (NYCHRL) N.Y.C. Admin. Code § 8-101. The defendants move for summary judgment on all of the plaintiff's claims.

### I. MCDONNELL DOUGLAS FRAMEWORK

#### A. DISCRIMINATION

I analyze the motion using the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). To prevail on his Title VII and NYSHRL claims, the plaintiff must establish a *prima facie* case of discrimination. *See id.*; *Holleman v. Art Crating Inc.*, No. 12-CV-2719, 2014 WL 4907732, at *22 (E.D.N.Y. Sept. 30, 2014) (discrimination claims brought pursuant to Title VII and the NYSHRL are "analytically identical," and "the same standard of proof" applies to both statutes (citing *Salamon*, 514 F.3d at

226)). Once the plaintiff makes that showing, "the burden of production [shifts] to the employer and require[es] the employer to come forward with its justification for the adverse employment action against the plaintiff." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). If the employer meets this burden, "the presumption 'drops out of the picture'" and the plaintiff must demonstrate that the employer's explanation is pretextual. *Id.*; *see also Garcia v. Hartford Police Dep't,* 706 F.3d 120, 127 (2d Cir. 2013) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003)). Whether or not the plaintiff proves pretext, he "bears the ultimate burden of persuasion, and must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004).

### 1. Plaintiff's *Prima Facie* Case of Discrimination

To establish a *prima facie* case of discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he has suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802–04; *Littlejohn*, 795 F.3d at 307. The parties agree that the plaintiff is a member of a protected class. However, the defendants argue that the plaintiff has not established the remaining three elements of the *prima facie* case.

The "qualification" prong requires that a plaintiff need only "establish basic eligibility for the position at issue," by showing that he or she "possesses the basic skills necessary for performance of [the] job." *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 91-92 (2d Cir. 2001) (citing *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)). The defendants concede that they believed that the plaintiff was qualified to be the CFO when they hired him, but argue that it became apparent that he was not up to the job. However,

9

determining whether the plaintiff was qualified does not depend on whether the defendants were ultimately satisfied with his work. *See Slattery*, 248 F.3d at 92. Instead, consistent with the plaintiff's *de minimis* burden to allege a *prima facie* case, the plaintiff must show "basic eligibility" for the job. *See id.* The plaintiff has clearly done that.

The plaintiff asserts the following examples of adverse employment actions: he was given a cubicle rather than a private office, he was not given support staff or "access to other employees," he was told not to speak Hindi, and he was terminated. (ECF No. 52 at 18.) The defendants do not dispute that the plaintiff sat in a cubicle and did not have a dedicated support staff, but they deny that they promised him an office and support staff by a specific date. In any event, neither condition is an adverse employment action because there was no materially adverse *change* in the plaintiff's employment; he sat in a cubicle and had no support staff from his very first day of work. *See Fletcher v. ABM Bldg. Value*, No. 18-CV-1232, 2019 WL 2288327, at \*2 (2d Cir. May 29, 2019) ("An adverse employment action is one that results in a 'materially adverse change in the terms and conditions of employment,' and the change is materially adverse if it is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" (citing *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004))) (summary order). Accordingly, I find that the only adverse employment actions the plaintiff suffered was his termination. *See Fletcher*, 2019 WL 2288327 at \*2 (examples of adverse employment actions include "a cut in pay, a change in title, a diminution in authority, or a measurable loss of status").

Whether the plaintiff has established the final element of his *prima facie* case — that the circumstances give rise to an inference of discrimination — is a closer call. However, giving the plaintiff the benefit of any doubt, there are some questions of material fact about whether the

10

claimed statements — "Jews are smarter than Indians" and the directions to stop speaking Hindi — raise an inference of discrimination. *See Jones v. Mayflower Int'l Hotel Grp., Inc.*, No. 15-CV-4435, 2018 WL 3999586, at *6 (E.D.N.Y. July 3, 2018) (denying summary judgment because "The evidence proffered by the Plaintiff is sufficient to raise a genuine issue of material fact as to whether Defendants' decision was motivated by discriminatory animus and Defendants' proffered non-discriminatory rationale for Plaintiffs termination is mere pretext."). The plaintiff asserts that the defendants commented several times that all "Jews are smarter than Indians" and that they asked him not to speak Hindi at the office, while permitting other employees to speak different languages. The defendants deny making these statements, and point out that no other witnesses heard them. They also say that Acs once asked the plaintiff not to use Hindi when he spoke to Quickbooks support because he was concerned that the plaintiff was disclosing company secrets. However, the plaintiff does not cite any facts to suggest that the statements were connected to an adverse employment action.

Viewing the evidence in the light most favorable to the plaintiff, I draw the inference in his favor and find that he has raised a *prime facie* case of discrimination. *See, e.g., See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 47 (2d Cir. 2019) ("Viewing as a whole, rather than piecemeal, Garett's testimony as to her treatment and the statements made to her by Anthropologie managers, the jury could find that Garett—castigated, denied the training given to younger employees, and excluded from management meetings—was subjected to age-related discrimination, criticism, and ostracism nearly every day."); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253 (2d Cir. 2014) ("the phrasing "better fit" or "fitting in" just might have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, even when isolated, could be enough to create a reasonable question of fact for a jury").

11

### 2. The Defendants' Legitimate Explanation for the Adverse Employment Action

Once the plaintiff provides a *prima facie* case of discrimination, the defendants can rebut his *prima facie* case by "articulat[ing] but ... not prov[ing]" a legitimate, non-discriminatory reason for the adverse employment action. *Fisher v. Vassar College*, 70 F.3d 1420, 1433 (2d Cir. 1995). The defendants' burden is one of production rather than one of persuasion. *Cramer v. Pyzowski*, No. 04-CV-1122, 2007 WL 1541393, at *8 (E.D.N.Y. May 25, 2007) (citing *Fisher*, 70 F.3d at 1433).

The defendants have articulated a legitimate, non-discriminatory reason for terminating the plaintiff; they explain why his job performance was unsatisfactory, and produced evidence that they terminated the plaintiff after 93 days of employment – three days after the plaintiff's probationary period ended.[14] This suggests that his termination was connected to the end of the probationary period rather than any discriminatory animus. The defendants have satisfied their step-two burden of production, so the burden shifts back to the plaintiff. *See Cramer*, 2007 WL 1541393, at *8.

### 3. Pretext

Once the defendants articulate legitimate, nondiscriminatory reasons for the adverse employment actions, the plaintiff has to prove by a preponderance of the evidence that the defendants' reasons were pretexts for discrimination. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992). "This may be done either by persuading the trier of fact that a discriminatory reason more likely than not motivated the employer, or by persuading the trier of fact that the employer's proffered explanation is unworthy of belief." *Id.* (internal citations

---

[14] The defendants also dispute that the cubicle and support staff issues are adverse employment actions. As noted above, I agree.

12

omitted). It is not enough, however, for the plaintiff "merely to show that he satisfies '*McDonnell Douglas's* minimal requirements of a *prima facie* case'... the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue." *Schreiber v. Worldco*, LLC, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) (internal citations omitted). The issue of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79 (2d Cir. 2001).

As explained above, the plaintiff put forth a *prima facie* case of discrimination and the defendants responded with a legitimate, non-discriminatory reason for terminating the plaintiff. Indeed, the timing of the plaintiff's termination – three days after the 90-day probationary period ended – suggests that the defendants followed their own policy in terminating the plaintiff.[15] It is also worth noting that defendants Acs and Jacobi interviewed and hired the plaintiff, knowing that he was Indian, and made the decision to fire him together. They are therefore entitled to an inference that they did not fire the plaintiff with discriminatory animus. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'" (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)) (collecting cases); *Inguanzo v. Hous. & Servs., Inc.*, 621 F. App'x 91, 92 (2d Cir. 2015) ("Inguanzo's sex discrimination claim is further

---

[15] The plaintiff disputes that he received or read the employee handbook that contained the defendants' policy, but the record establishes that the defendants did, in fact, have such a policy. That the defendants followed their own policy weighs against a finding that their reasons for terminating the plaintiff were pretextual. *See, e.g., McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 61 (2d Cir. 2018) (granting summary judgment to defendants because plaintiff failed to show pretext: "While an inference of pretext may arise where an employer's deviation from its procedures results in the challenged employment decision... the record here demonstrates no such deviation.").

undermined by the fact that she was hired and fired by the same person." (citing *Carlton*, 202 F.3d at 129)).

Nevertheless, when the record is viewed in its entirety, there are material questions of fact about whether the defendants acted with discriminatory animus. For example, it is impossible to resolve on this record whether the defendants repeatedly told the plaintiff to stop speaking Hindi – and whether in doing so, they demonstrated discriminatory animus – because it would require the Court to make a credibility determination as to which party is telling the truth, a determination that is the province of the factfinder. Nor can the Court determine when the alleged statements were made vis a vis the decision to terminate the plaintiff. Additionally, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Lowe v. Mount Sinai Health Sys., Inc.*, No. 16-CV-6074, 2018 WL 2089345, at *4 (S.D.N.Y. May 4, 2018), *aff'd*, 764 F. App'x 120 (2d Cir. 2019) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). Accordingly, I find that material issues of fact as to whether the defendants acted with discriminatory animus preclude summary judgment on the plaintiff's Title VII and NYSHRL discrimination claims.

## B. RETALIATION

The plaintiff's Title VII and NYSHRL retaliation claims are also analyzed according to the *McDonnell Douglas* burden-shifting analysis. *See Abrams*, 764 F.3d at 254. The plaintiff must first make out a *prima facie* case of retaliation by showing by a preponderance of the evidence: 1) participation in a protected activity known to the defendant; 2) an employment action disadvantaging him; and 3) a causal connection between the protected activity and his termination. *Lowe*, 2018 WL 2089345, at *4 (citing *Lore v. City of Syracuse*, 670 F.3d 127, 157

(2d Cir. 2012)). It is undisputed that the plaintiff was terminated, so in order to establish a *prima facie* case, he must show that he engaged in protected activity known to the defendants and that there was a causal connection between his protected activity and the decision to terminate him. Because I find that the plaintiff has not made out a *prima facie* case of retaliation, I do not engage in the remainder of the burden-shifting analysis.

Protected activity includes any complaints of discrimination made directly to an employer's decisionmakers or complaints of which the employer had knowledge. *Littlejohn*, 795 F.3d at 317 ("When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009))); *Galdieri–Ambrosini v. Nat'l Realty and Dev't Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."). Because the plaintiff did not file his EEOC complaint until after he was terminated, he must rely on evidence that he made informal, verbal complaints of discrimination to prove that he engaged in protected activity. *See Littlejohn*, 795 F.3d at 316.

As discussed above, the only evidence that the plaintiff complained about discrimination to the defendants is his testimony that he verbally confronted them; he gives no detail about when the complaints were made, to whom they were made, or the circumstances under which they were made. The individual defendants deny that the plaintiff complained to them about discrimination, and there is no evidence that other employees heard any complaints. However, because I must view the evidence in the light most favorable to the plaintiff, and resolve all

factual disputes in his favor, I find that the plaintiff engaged in protected activity by making verbal complaints of discrimination.

Even though the plaintiff has met his burden in showing that he engaged in protected activity, he fails to establish a *prima facie* case of retaliation because there is no evidence of a causal connection between the plaintiff's complaints of discrimination and the decision to terminate him. *See Lowe*, 2018 WL 2089345, at *6 ("Although Lopiano's remarks should not be considered 'stray' or infrequent, crediting Plaintiff's testimony... there is insufficient support in the record to show a connection between such racial animus and the termination decision. The record shows that the decision to terminate Plaintiff was motivated by legitimate business reasons.") Unlike Title VII discrimination claims, for an adverse retaliatory action to be "because" a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

The plaintiff says only that he made "several" complaints; he gives no timeframe at all. There is no evidence that the defendants fired the plaintiff soon after he complained. In fact, the plaintiff says the defendants treated him poorly from the start of his employment. He therefore cannot rely on "temporal proximity" to establish a causal nexus between his complaints and termination. Nor does the plaintiff cite any additional facts that suggest that his complaints were connected to the decision to terminate him. Accordingly, there is no evidence from which the Court can conclude that the defendants took any kind of action in response to his complaints of

discrimination.[16] The plaintiff has not set forth a *prima facie* case of retaliation pursuant to Title VII and the NYSHRL, and those claims are dismissed.

## II. MIXED MOTIVE FRAMEWORK

In a "mixed motive" case, the plaintiff can prevail by showing that discriminatory intent was a "motivating" or "substantial" factor in the employer's decision to terminate him. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989); *see also* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). "[T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [race] into account." *Price Waterhouse*, 490 U.S. at 258. "[P]laintiff's initial burden in a *Price Waterhouse* mixed-motive case is heavier than the de minimis showing required to establish a *prima facie McDonnell Douglas* case... [T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a smoking gun or at least a thick cloud of smoke to support his allegations of discriminatory treatment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60–61 (2d Cir. 1997) (internal citations omitted). The plaintiff "must focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Tyler*, 958 F.2d at 1181 (citing *Price Waterhouse*, 490 U.S. at 258).

I reach the same result on the plaintiff's discrimination and retaliation claims under the mixed motive framework. The plaintiff has met his initial burden of showing a *prima facie* case

---

[16] In fact, the evidence provided by the defendants shows that the plaintiff was fired less than two months after his "confrontation" with a coworker and after several other coworkers complained about him, and three days after his probationary period ended.

17

of discrimination and raised questions of material fact as to whether the defendants were motivated by discriminatory animus, but he has not met his burden on the retaliation claims. While there is a material dispute about whether the defendants made discriminatory statements, there is insufficient evidence that the plaintiff's complaints about these statements caused his termination. *See Lowe*, 2018 WL 2089345 at *8 (holding "a legitimate, non-discriminatory reason existed for the termination of Plaintiff's employment, and that Plaintiff cannot show that discrimination or retaliation caused her termination"). There is certainly no "direct evidence" that he engaged in protected activity that caused the defendants to terminate him, as required by the *Price Waterhouse* precedent. *See, e.g., Raskin*, 125 F.3d at 61 ("Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers "that may be viewed as *directly reflecting* the alleged discriminatory attitude"). Accordingly, applying the mixed motive framework does not compel a different result.

### III. NYCHRL CLAIMS

The Court must analyze NYCHRL claims "separately and independently from any federal and state law claims" and construe the NYCHRL's provisions "broadly in favor of discrimination plaintiffs." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)). Section 8-107(7) of the NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). The Restoration Act further provides that "The retaliation or discrimination... need not result in an ultimate action with respect to employment... provided, however, that the retaliatory or discriminatory act or acts complained of must be

18

reasonably likely to deter a person from engaging in protected activity." Restoration Act § 3 (amending N.Y.C. Admin. Code § 8–107(7)). To prevail on its motion for summary judgment on the plaintiff's NYCHRL claims, the defendants are required to show that, based on the evidence before the Court and drawing all reasonable inferences in the plaintiff's favor, no jury could find that they treated the plaintiff "less well" than other employees, at least in part because of his race, national origin and religion. *See Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 13 (2d Cir. 2013).

For the reasons discussed above, there are issues of material fact precluding summary judgment on the plaintiff's Title VII and NYSHRL discrimination claims; therefore, these issues of fact also preclude summary judgment under the broader NYCHRL standard for discrimination. However, the plaintiff's NYCHRL retaliation claim fails. Even under the more relaxed NYCHRL retaliation standard, he must still show that a "nexus exists between the allegedly discriminatory statements and [the] defendant[s'] decision to discharge the plaintiff." *Godbolt v. Verizon New York Inc.*, 115 A.D.3d 493, 495 (1st Dep't 2014) (citing *Schreiber*, 324 F Supp 2d at 518). He also must show that the defendants engaged in conduct "reasonably likely to deter a person engaging in" the protected activity. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (affirming dismissal of NYCHRL discrimination and retaliation claims on summary judgment). The plaintiff has failed to do so. Therefore, the defendants' motion for summary judgment on the NYCHRL retaliation claim is granted, and the claim is dismissed.

## CONCLUSION

The defendants' motion for summary judgment on the plaintiff's discrimination claims pursuant to Title VII, the NYSHRL and the NYCHRL is denied and their motion on the

plaintiff's retaliation claims pursuant to the same statutes is granted. To be clear, Counts One through Nine of the Amended Complaint will proceed to trial and Counts Ten through Twelve are dismissed.

**SO ORDERED.**

                                                        s/Ann M. Donnelly

                                                       Ann M. Donnelly
                                                      United States District Judge

Dated: Brooklyn, New York
       July 22, 2019